**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 15-1551**

---

FOREST CAPITAL, LLC,

        Plaintiff - Appellant,

    v.

BLACKROCK, INC.,

        Defendant - Appellee.

------------------------------

COMMERCIAL FINANCE ASSOCIATION,

        Amicus Supporting Appellant,

SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION,

        Amicus Supporting Appellee.

---

Appeal from the United States District Court for the District of Maryland, at Baltimore. J. Frederick Motz, Senior District Judge. (1:14-cv-01530-JFM)

---

Argued: May 11, 2016            Decided: August 10, 2016

---

Before GREGORY, Chief Judge, and WILKINSON and DIAZ, Circuit Judges.

---

Affirmed by unpublished opinion. Judge Diaz wrote the opinion, in which Chief Judge Gregory and Judge Wilkinson joined.

**ARGUED:** Jeffrey A. Wurst, RUSKIN MOSCOU FALTISCHEK, P.C., Uniondale, New York, for Appellant. Thomas E.L. Dewey, DEWEY PEGNO & KRAMARSKY LLP, New York, New York, for Appellee. **ON BRIEF:** David C. Gartenberg, DEWEY PEGNO & KRAMARSKY LLP, New York, New York, for Appellee. David J. Chizewer, Richard M. Kohn, Amanda G. Penabad, GOLDBERG KOHN LTD., Chicago, Illinois; Jonathan N. Helfat, Chad B. Simon, OTTERBOURG P.C., New York, New York, for Amicus Commercial Finance Association. Kevin Carroll, SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION, Washington, D.C.; Lewis J. Liman, Sandra M. Rocks, Abena A. Mainoo, CLEARY GOTTLIEB STEEN & HAMILTON LLP, New York, New York, for Amicus The Securities Industry and Financial Markets Association.

———————

Unpublished opinions are not binding precedent in this circuit.

2

DIAZ, Circuit Judge:

BlackRock, Inc., an investment firm, received a letter from its customer, People's Power & Gas ("PP&G"), stating that PP&G had assigned a security interest in its BlackRock account to a creditor, Forest Capital, LLC. PP&G's letter requested that future remittances from the account be sent to Forest. When PP&G changed its mind and asked to receive funds, BlackRock complied. According to Forest, BlackRock's payment to PP&G violated two sections of Article 9 of the Maryland Uniform Commercial Code (UCC) and amounted to conversion. The district court dismissed the complaint for failure to state a claim. Because the UCC provisions on which Forest relies do not provide a private right of action, and because the property Forest seeks to recover is not subject to a claim for conversion, we affirm.

I.

A.

PP&G is an energy service company.[1] It buys energy from ISO New England ("ISO-NE"), which extends PP&G credit and, for

---

[1] We derive our account of the facts from Forest's complaint, viewing them in the light most favorable to Forest and drawing all reasonable inferences in its favor. See Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). We have also considered several documents attached to the complaint and to BlackRock's subsequent motions, which we are authorized to rely on because we find them "integral to the
(Continued)

collateral, requires PP&G to deposit funds into a BlackRock account held in PP&G's name. To perfect its security interest in the account, ISO-NE entered into a Control Agreement with BlackRock and PP&G; as relevant here, the Control Agreement authorized BlackRock to release funds to PP&G at ISO-NE and PP&G's joint request.

PP&G, in turn, sells energy to end users on credit, but rather than collect payment, it sells its accounts receivable to Forest at a discount. This arrangement between PP&G and Forest, known as factoring, is set out in a Master Factoring Agreement ("MFA"). The MFA includes two other obligations relevant here. First, Forest agreed to fund up to 75 percent of the collateral PP&G was required to maintain in the BlackRock account. Second, PP&G granted Forest a security interest in substantially all of its assets, with the exception of "prepayments to third parties for energy purchases." J.A. 41.

In December 2013, Forest discovered that PP&G had "fail[ed] to fulfill various obligations under the MFA" and, as a result, declared PP&G in default. J.A. 11. To induce Forest not to enforce its default remedies, PP&G's CEO, David Pearsall, sent a

---

complaint and authentic." Kensington Volunteer Fire Dep't, Inc. v. Montgomery County, 684 F.3d 462, 467 (4th Cir. 2012) (quoting Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009)).

letter to BlackRock notifying it of "certain financing agreements entered into by and between [PP&G] and Forest":

> PP&G has granted Forest a security interest in substantially all of its assets including, but not limited to, all payment intangibles which may be owed at any time by BlackRock . . . to PP&G, including the return of any deposits or any part thereof given by or on behalf of PP&G to BlackRock . . . . Accordingly, this shall serve as notification and authorization that you are to remit to Forest all monies that may be or may become payable by BlackRock to [PP&G]. This instruction cannot be changed except by a writing duly executed by Forest. All payments to or for the benefit of PP&G and/or Forest may only be sent by wire as follows . . . .

J.A. 48. Forest never changed the instruction, but Pearsall did. He asked BlackRock to remit funds directly to PP&G, and BlackRock complied, making two payments to PP&G totaling more than $1,000,000.

B.

Believing itself entitled to the transferred funds, Forest quickly filed suit, asserting claims of breach of contract against PP&G, breach of guaranty of validity against Pearsall, and conversion and a violation of UCC section 9-607 against BlackRock. The parties agreed to a Stipulation and Order of Settlement, according to which BlackRock paid some funds from the account to Forest, and the suit was dismissed without prejudice, with all parties reserving their rights, remedies, and defenses.

5

After PP&G entered Chapter 7 bankruptcy, Forest filed suit against BlackRock for (1) conversion, (2) violation of UCC section 9-607, (3) violation of UCC section 9-406, and (4) an accounting. BlackRock moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), and the district court granted the motion. Forest Capital LLC v. BlackRock, Inc., No. JFM-14-1530, 2015 WL 874611 (D. Md. Feb. 26, 2015). Forest's subsequent motion for reconsideration was denied.

This appeal followed.

## II.

We review de novo the district court's grant of BlackRock's motion to dismiss for failure to state a claim. Kensington Volunteer Fire Dep't, Inc. v. Montgomery County, 684 F.3d 462, 467 (4th Cir. 2012). We accept as true all of the complaint's factual allegations, ensuring that it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" De'lonta v. Johnson, 708 F.3d 520, 524 (4th Cir. 2013) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). We may affirm "on any legal ground supported by the record and are not limited to the grounds relied on by the district court." Jackson v. Kimel, 992 F.2d 1318, 1322 (4th Cir. 1993). Because this case involves matters of state law only, "our role is to apply the governing state law, or, if

6

necessary, predict how the state's highest court would rule on an unsettled issue." Askew v. HRFC, LLC, 810 F.3d 263, 266 (4th Cir. 2016) (quoting Horace Mann Ins. Co. v. Gen. Star Nat'l Ins. Co., 514 F.3d 327, 329 (4th Cir. 2008)).

On appeal, Forest objects to the dismissal of its claims for violation of the UCC and for conversion, and it argues that the district court abused its discretion in ignoring Forest's request to amend its complaint and in denying its motion for reconsideration. We address these issues in turn.

A.

Forest asserts that BlackRock's transfer of funds to PP&G was made "in violation of" sections 9-406 and 9-607 of the UCC. J.A. 17, 18. Because we accept BlackRock's argument that these UCC sections do not provide a private right of action, we affirm the district court's dismissal of the claims.[2]

1.

When determining whether a state statute creates a private right of action, "the central inquiry [is] whether the legislative body intended to create [one], either expressly or by implication." Fangman v. Genuine Title, LLC, 136 A.3d 772, 779 (Md. 2016) (quoting Baker v. Montgomery County, 50 A.3d

---

[2] We decline to address the district court's holdings regarding the validity of Forest's security interest or the adequacy of notice given to BlackRock.

7

1112, 1123 (Md. 2012)).  Here, Forest does not argue that the statute expressly creates a right, so we decide only whether one is implied.  Maryland courts ask three questions to determine whether a state statute implies a private right of action:

> (1) Is the plaintiff one of the class for whose special benefit the statute was enacted?  (2) Is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?  (3) Is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

Id. at 780; see also Erie Ins. Co. v. Chops, 585 A.2d 232, 236-37 (Md. 1991) (holding that a statute requiring auto insurers to notify the Motor Vehicle Administration of the cancellation of an insured's policy did not create a private right of action in favor of a plaintiff injured by an uninsured driver whose lapse in coverage the insurer failed to report).  If "neither the statute nor the legislative history reveals a legislative intent to create a private right of action for the benefit of the plaintiff," a court need proceed no further.  Genuine Title, 136 A.3d at 779 (quoting Baker, 50 A.3d at 1123).

In construing the UCC, Maryland courts use "the same principles of statutory construction that . . . would apply in determining the meaning of any other legislative enactment," though some consideration is given to maintaining uniformity among jurisdictions.  Jefferson v. Jones, 408 A.2d 1036, 1039 (Md. 1979).  These interpretive principles "require

8

ascertainment of the legislative intent, and if . . . construction becomes necessary because the terminology chosen is not clear, then [the court] must consider not only the significance of the literal language used, but the effect of [a] proposed reading in light of the legislative purpose sought to be accomplished." Id. Moreover, the UCC's Official Comments "are an excellent place to begin a search for the legislature's intent when it adopted the Code," though "these comments are not controlling authority and may not be used to vary the plain language of the statute." Id.

2.

We begin with section 9-406(a). According to Forest, the statute grants a private right of action to an assignee (Forest) against an account debtor (BlackRock) who, after receiving notice that its debt has been assigned, pays the assignor (PP&G) rather than the assignee.[3]

In relevant part, the statute provides:

> [A]n account debtor on an account, chattel paper, or a payment intangible may discharge its obligation by paying the assignor until, but not after, the account debtor receives a notification, authenticated by the assignor or the assignee, that the amount due or to become due has been assigned and that payment is to be made to the assignee. After receipt of the notification, the account debtor may discharge its

---

[3] BlackRock objects to being called an account debtor, but we need not address the issue because of our holding that the statute does not provide Forest a right of action.

9

> obligation by paying the assignee and may not discharge the obligation by paying the assignor.

Md. Code Ann., Com. Law § 9-406(a). An "account debtor" is "a person obligated on an account, chattel paper, or general intangible." § 9-102(3). An account debtor, therefore, is simply the name given to a person with certain kinds of payment obligations. A "general intangible" is "any personal property, including things in action, <u>other than</u> accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, or other minerals before extraction." § 9-102(42) (emphasis added). This is of course a catchall definition of exclusion, but the UCC does tell us that the term "includes payment intangibles and software." <u>Id.</u> "Payment intangible" is further defined as "a general intangible under which the account debtor's principal obligation is a monetary obligation." § 9-102(62).

With these definitions in mind, we return to the operation of section 9-406(a). A person indebted on a payment intangible (the account debtor) may satisfy its obligation by paying its creditor (the assignor) until it receives notice that the assignor has assigned the right to receive payment. After notification, the account debtor may satisfy the obligation only by paying the assignee.

10

To determine whether section 9-406 provides an implied right of action, we first ask whether Forest (the assignee) is part of the class for whose special benefit the statute was enacted.  To the extent the statute grants any rights, it grants one to the account debtor, not to the assignee, as it explains when the account debtor "may discharge its obligation" and avoid making payments to both the assignor and assignee.  See In re Taranto, No. 10-76041-AST, 2012 WL 1066300, at *11 (Bankr. E.D.N.Y. Mar. 27, 2012) (stating that N.Y. U.C.C. Law § 9-406 "prevents different creditors from being paid twice for the same debt").  The commentary confirms this reading, stating that "[s]ubsection (a) provides the general rule concerning an account debtor's right to pay the assignor until the account debtor receives the appropriate notification."  Md. Code Ann., Com. Law § 9-406 cmt. 2 (emphasis added).

Accordingly, because the statute grants rights to the account debtor rather than the assignee, we think the better view of the statute is that account debtors are its special beneficiaries.  Cf. Auto. Acceptance Corp. v. Universal C.I.T. Credit Corp., 139 A.2d 683, 686 (Md. 1958) (referring to a similar provision in a now-repealed statute, Md. Code, art. 8, sec. 2 (1951), as "protecting a debtor who pays to the assignor without notice of the assignment" (emphasis added)).  But even if we were to assume that Forest is part of the class the

11

legislature was specially intending to benefit, we would still proceed to the second question, whether there is "legislative intent, explicit or implicit, either to create . . . a remedy or to deny one." Genuine Title, 136 A.3d at 779 (quoting Baker, 50 A.3d at 1122); see also id. at 786 (noting that members of the class for whose benefit a statute was enacted may still lack a private right of action).

Nothing suggests such an intention. As noted, if section 9-406 grants any rights, it grants them to the account debtor. It grants no rights to the assignee and imposes no obligations on the account debtor; whatever "obligation" the account debtor may have is assumed to exist already. Section 9-406 simply explains how to satisfy that obligation, providing a potential defense to an account debtor who has already paid the assignor or assignee. This is strong evidence that the legislature did not intend to confer a private right of action. See Baker, 50 A.3d at 1123 ("If a statute's language provides a right to a particular class of persons, there is a strong inference that the legislature intended the statute to carry an implied cause of action. Conversely, that inference becomes attenuated when the statute is framed as a 'general prohibition or a command' to a governmental entity or other group or confers a generalized benefit." (citations omitted) (quoting Univs. Research Ass'n v. Coutu, 450 U.S. 754, 772 (1981))). The lack of evidence of

12

legislative intent alone defeats Forest's argument that section 9-406 confers a right of action.

A right of action for the assignee is also inconsistent with the underlying purpose of the statute, which is to clarify an account debtor's payment obligation when its debt is assigned. The court's decision in Platinum Funding Services, LLC v. Petco Insulation Co., No. 3:09CV1133 MRK, 2011 WL 1743417 (D. Conn. May 2, 2011), makes this point. There, the plaintiff was a factor who purchased some but not all of the accounts receivable of the assignor. The plaintiff gave the account debtor notice under section 9-406 that payment on all invoices should be made to the plaintiff—the purported assignee—and not to the assignor. Id. at *2. When the account debtor made payments to the assignor on invoices that the plaintiff had neither purchased nor been assigned, the plaintiff nevertheless alleged it was entitled to recover under section 9-406, solely on the basis that notice under the statute created a payment obligation. Id. at *6. The court rejected this "novel legal theory of recovery": "Because the right to receive payments on those particular invoices was never assigned to [the plaintiff], UCC § 9-406 . . . [is] of no help to [the plaintiff's] cause." Id. at *9.

We agree with the court in Platinum Funding that "[t]he language of UCC § 9-406 . . . presumes that an 'assignor' has

13

already assigned its right to receive payment from an account debtor to an 'assignee.'" Id. And as the case demonstrates, creating a private right of action under section 9-406 could undercut that presumption, creating rights out of nothing more than a notification and submitting account debtors to obligations they never agreed to take on. We do not believe the Court of Appeals of Maryland would recognize such a right of action.

Nevertheless, Forest relies on Platinum Funding to press its contention that section 9-406 confers a right of action, apparently because the plaintiff there characterized its claim as one made under section 9-406, and the court never explicitly rejected that characterization. Forest is wrong. First, the court rejected the plaintiff's purported 9-406 claim. Second, whether section 9-406 confers a right of action was not an issue in the case. Finally, the court's description of the statute supports a reading consistent with ours, not Forest's: "When a factoring firm . . . provides an account debtor . . . with a notice under UCC § 9-406 . . ., the notice ensures that if the factoring firm later sues the account debtor for misdirecting payments to the factoring firm's assignor, the account debtor will not be able to assert in defense that it already paid the assignor." Id. at *8. The effect of the notice is to defeat the account debtor's defense that it has satisfied the debt, not

14

to create a freestanding cause of action for disregarding the notice.

In Forest's view, however, without "an independent cause of action in favor of a secured party, an assignee would be void of a remedy after an account debtor failed to abide by a notification." Reply Br. at 13. That is not correct. For example, in IIG Capital LLC v. Archipelago, L.L.C., 36 A.D.3d 401, 402 (N.Y. App. Div. 2007), the plaintiff was a factor who was assigned accounts receivable on which the defendants were obligated. Although the plaintiff gave notice of the assignment under section 9-406(a), the defendants never paid the plaintiff, who brought claims for breach of contract and account stated. See id. at 402-03.

The court denied the defendants' motion to dismiss, rejecting in particular their argument that they had already settled the accounts with the assignor. Id. at 404. Because the accounts "were assigned to plaintiff pursuant to the factoring agreement, and proper notice was given [under section 9-406], defendants' payment in settlement to [the assignor] would not be a defense to an action by plaintiff to collect on the accounts." Id. As IIG demonstrates, an assignee who has provided notice under section 9-406 has other remedies available when an account debtor pays the assignor and refuses to pay the assignee.

15

We find even less reason to think that UCC section 9-607(a) provides Forest a private right of action.  The statute reads as follows:

> If so agreed, and in any event after default, a secured party:
>
> (1) May notify an account debtor or other person obligated on collateral to make payment or otherwise render performance to or for the benefit of the secured party;
>
> . . .
>
> (3) May enforce the obligations of an account debtor or other person obligated on collateral and exercise the rights of the debtor with respect to the obligation of the account debtor or other person obligated on collateral to make payment or otherwise render performance to the debtor, and with respect to any property that secures the obligations of the account debtor or other person obligated on the collateral . . . .

§ 9-607(a).  Subsection (e) clarifies that "[t]his section does not determine whether an account debtor . . . owes a duty to a secured party."  § 9-607(e).  Rather, as the commentary explains, "This section establishes only the baseline rights of the secured party <u>vis-a-vis the debtor</u> [i.e., PP&G]—the secured party is entitled to enforce and collect after default or earlier if so agreed."  Id. at cmt. 6 (emphasis added).

The statute does not expressly create a right of action for a secured party such as Forest, nor does it impose any obligations on an account debtor.  While section 9-607 does give

secured parties "the right to enforce claims that the debtor may enjoy against others," id. at cmt. 3, the text and commentary make plain that this is a right against the debtor-assignor, not the account debtor.

In sum, we hold that there is no private right of action for transfers made "in violation of [sections 9-406 and 9-607] of the UCC." J.A. 17, 18. Accordingly, the claims were properly dismissed.

4.

In its reply brief, Forest argues for the first time that, even if it has no claim under the UCC, it has nevertheless stated a claim for breach of contract. Reply Br. at 15. According to Forest, "the existence of a breach of contract claim is still plausible on the face of the Complaint—as the Complaint alleges that Forest, standing in the shoes of PP&G, is asserting a claim against BlackRock, an account debtor, as if BlackRock had failed to pay the funds to PP&G." Id.

However, "issues raised for the first time on appeal generally will not be considered." Karpel v. Inova Health Sys. Servs., 134 F.3d 1222, 1227 (4th Cir. 1998) (refusing to consider a hostile-work-environment claim presented to the district court after summary judgment had been granted for the defendant). And even when properly preserved issues are raised on appeal, they must be raised in the opening brief. See Carter

17

v. Lee, 283 F.3d 240, 252 n.11 (4th Cir. 2002). "Failure to comply with the specific dictates of this rule with respect to a particular claim triggers abandonment of that claim on appeal." Edwards v. City of Goldsboro, 178 F.3d 231, 241 n.6 (4th Cir. 1999) (emphasis added) (citing Fed. R. App. P. 28(a)(9)(A)); see also Stevenson v. City of Seat Pleasant, 743 F.3d 411, 416 (4th Cir. 2014) (holding that the appellants "waived any challenge" to the district court's dismissal of multiple claims by failing to present arguments on appeal regarding those claims); Bocek v. JGA Assocs., LLC, 537 F. App'x 169, 174 (4th Cir. 2013) ("Because [the plaintiff's] position on appeal is that the defendants' . . . actions breached the Straw Purchase Agreement, not the Consulting Agreement, we are constrained to conclude that [the plaintiff] has waived any breach of contract claim premised on a breach of the Consulting Agreement."). The purpose of this rule "is to avoid unfairness to an appellee and minimize the 'risk of an improvident or ill-advised opinion being issued on an unbriefed issue.'" Brown v. Nucor Corp., 785 F.3d 895, 920 (4th Cir. 2015) (quoting United States v. Leeson, 453 F.3d 631, 638 n.4 (4th Cir. 2006)).

Here, prior to the one-sentence assertion in its reply brief, Forest had given no indication that it was pursuing a claim based on a breach of contract. Indeed, Forest concedes that it "brought its action against BlackRock based upon

18

BlackRock's conversion of Forest's funds." Reply Br. at 15. Notably, Forest did not move in the district court to amend its complaint to allege the claim for breach. Rather, Forest has insisted throughout the litigation that BlackRock's liability arose out of ignoring the notification letter and wrongfully transferring funds to PP&G, a purported conversion and violation of the UCC. See, e.g., J.A. 16 ("The . . . transfers by BlackRock to PP&G at the request of Pearsall, despite the clear instructions in the Notification Letter, amount to conversion by defendant BlackRock."); J.A. 17 ("BlackRock transferred funds from the BlackRock Account directly to PP&G in violation of § 9-607 . . . ."); J.A. 18 ("BlackRock paid funds from the BlackRock Account directly to PP&G in violation of § 9-406 . . . ."); J.A. 426 (Forest stating in a heading of its memorandum in opposition to BlackRock's motion to dismiss, "The Control Agreement Does Not Affect Forest's Rights"); Appellant's Br. at 3 ("BlackRock failed to honor the notice it had received pursuant to UCC §§ 9-406 and 9-607 and improperly disbursed funds to PP&G . . . ." (emphasis added)); id. at 6-7 ("BlackRock disregarded the clear and unambiguous terms contained in the Notification and made payments directly to PP&G from the BlackRock Account[,] . . . thereby depriving Forest of its right to those funds. BlackRock's failure to abide by the terms of the Notification was a violation of both UCC §§ 9-406 and

19

9-607." (emphasis added) (citations omitted)); id. at 8 ("Forest's Complaint sufficiently set forth viable causes of action for each of its claims against BlackRock, all of which arise out of BlackRock's failure to comply with its obligations under the UCC." (emphasis added)).

We decline to consider Forest's belated breach-of-contract claim.

### B.

Next, Forest objects to the dismissal of its conversion claim. According to the complaint, BlackRock converted Forest's funds when it transferred them to PP&G rather than to Forest. J.A. 16. The district court dismissed the claim because Forest did not allege that BlackRock converted funds "for its own use and benefit." Forest Capital, 2015 WL 874611, at *1. In addition to defending the district court's holding, BlackRock argues that it did not exercise the necessary control over the funds or commit any wrongful act, and that the property Forest is seeking to recover is intangible and therefore not subject to conversion. Because we agree with this last argument, we do not reach the others.

Conversion in Maryland has two elements: "a physical act combined with a certain state of mind." Darcars Motors of Silver Spring, Inc. v. Borzym, 841 A.2d 828, 835 (Md. 2004). "The physical act can be summarized as 'any distinct act of

20

ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it.'" Id. (quoting Allied Inv. Corp. v. Jasen, 731 A.2d 957, 963 (1999)). The intent element is satisfied by "a wide range of different states of mind," but "[a]t a minimum, a defendant liable of conversion must have 'an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights.'" Id. at 836 (quoting Keys v. Chrysler Credit Corp., 494 A.2d 200, 208 (Md. 1985)).

Not all personal property is subject to conversion. Historically, the tort was confined to recovering tangible property, but over time it has expanded to cover some, but not all, intangible property rights. Dan B. Dobbs, et al., The Law of Torts §§ 709-710 (2d ed. 2016); see Thompson v. UBS Fin. Servs., Inc., 115 A.3d 125, 130-31 (Md. 2015). "Maryland law does not recognize a tort claim for conversion of intangible property interests unless they are merged into a tangible document over which the defendant exercises some form of ownership or dominion." Jasen, 731 A.2d at 965. Examples include "a stock certificate, a promissory note, or a document that embodies the right to a life insurance policy." Thompson, 115 A.3d at 131 (citations omitted).

Under Forest's theory of the case, the property it seeks to recover must be intangible. If Forest had any right to receive

21

money from BlackRock, it was because section 9-406 transferred BlackRock's payment obligation from PP&G to Forest. And, because section 9-406 applies only to obligations on accounts, chattel paper, or payment intangibles—here, only a payment intangible is arguable—Forest had a right to payment only if BlackRock was obligated on a payment intangible. Because a payment intangible is, of course, intangible property, and here it was not "merged into a tangible document over which [BlackRock] exercise[d] some form of ownership," it is not subject to conversion. Jasen, 731 A.2d at 965.

We pause here to note that the parties' (and the amici's) briefs are devoted in large part to the question of whether BlackRock was obligated on a payment intangible and was therefore an account debtor under section 9-406. We need not answer the question, as the conversion claim fails no matter who is right. If (as Forest contends) BlackRock's payment obligation was a payment intangible, then the type of property at issue could not have been converted—it was intangible and Forest never alleged it was merged into a document over which BlackRock exercised dominion. And if (as BlackRock contends) the obligation was not a payment intangible, then section 9-406 did not apply, the notification letter had no effect, and the transfer to PP&G did not interfere with Forest's rights. In either case, Forest could not state a claim for conversion.

22

To avoid this conclusion, Forest attempts to have it both ways, characterizing the property interest as a payment intangible for the purposes of applying section 9-406, but as money for the purposes of the conversion claim. See Reply Br. at 21 ("The payment intangible is the property interest—the monetary obligation which attached to the funds once [ISO-NE] released its interest."). For, although money is generally an intangible not subject to conversion, an exception exists for "specific segregated or identifiable funds." Jasen, 731 A.2d at 966. But having conceded that BlackRock's only possible obligation to Forest was on a payment intangible, Forest is stuck with the fact that a payment intangible is by definition not money. See § 9-102(42) (defining a general intangible, which includes payment intangibles, as "any personal property, . . . other than . . . money"). Accordingly, regardless of whether the transferred funds were "specific segregated or identifiable funds," Forest asserts no interest in them. Its asserted interest is in payment, not in any particular money.

For this reason, Forest's reliance on Franklin American Mortgage Co. v. Sanford Title Services, LLC, No. RDB 10-920, 2011 WL 310469 (D. Md. Jan. 26, 2011), is misplaced. There, the plaintiff, a mortgage company, alleged that it wired money to a closing agent, who failed to apply the money to pay off

23

mortgages and closing costs as it had promised.  Id. at *1. According to the court, this money-based conversion claim could go forward because it met "an exception for a conversion action seeking funds that were or should have been segregated into separate accounts."  Id. at *4.  Unlike the plaintiff in Franklin American, Forest did not give funds to BlackRock that were diverted from their intended purpose.  We do not see how the case would apply to the facts here, where Forest claims a right to payment rather than to specific funds.

## C.

Forest also takes issue with the district court's denial of its request to amend its complaint.  Because the issue Forest wished to address in an amended complaint—whether the BlackRock funds were "prepayments" excluded from Forest's security interest—is not relevant to our disposition of Forest's claims, we need not decide whether the district court erred.

## D.

Finally, Forest contends that the district court should have granted its "Motion to Reconsider and/or to Reargue," which sought relief under either Rule 59(e) or 60(b) of the Federal Rules of Civil Procedure.

We would ordinarily review the district court's decision on a motion under Rule 59(e) or 60(b) for an abuse of discretion. See Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co., 148 F.3d 396, 402

24

(4th Cir. 1998) (Rule 59(e)); <u>McLawhorn v. John W. Daniel & Co.</u>, 924 F.2d 535, 538 (4th Cir. 1991) (Rule 60(b)). But because we are also reviewing the underlying grant of BlackRock's motion to dismiss, we have already considered the merits of the judgment under a de novo standard, which is of course more favorable to Forest than a review for abuse of discretion.[4] Accordingly, we need not decide whether the district court abused its discretion. <u>See</u> <u>Stevenson</u>, 743 F.3d at 416 (applying de novo review where notice of appeal sought review of summary-judgment order as well as Rule 59(e) and Rule 60(b) orders).

## III.

We affirm the district court's judgment dismissing Forest's claims under the UCC and for conversion.

AFFIRMED

---

[4] Forest's motion also addressed the district court's denial of its request to amend, which we would review for abuse of discretion, <u>see</u> <u>Francis v. Giacomelli</u>, 588 F.3d 186, 197 (4th Cir. 2009); as we have explained, we need not address the issue.

25